**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Martinsburg**

**KINSALE INSURANCE COMPANY,**

Plaintiff,

v.
**CIVIL ACTION NO. 3:20-CV-8**
Judge Bailey

**JDBC HOLDINGS, INC.**
d/b/a The CBD Factories,

Defendant.

**SEALED MEMORANDUM OPINION AND ORDER**

Pending before this Court are competing Motions for Summary Judgment. *See* [Docs. 63 & 65]. Additionally pending is a Motion for Leave to File Under Seal and to Challenge Improper Confidentiality Designations. *See* [Doc. 64]. Having been extensively briefed, these motions are now ripe for adjudication. For the reasons contained herein, this Court will (1) deny Kinsale Insurance Company's Motion for Summary Judgment [Doc. 65]; (2) deny, in part, the Motion for Leave to Provisionally File JDBC's Memorandum of Law in Support of its Motion for Partial Summary Judgment as to Insurance Coverage and Supporting Exhibits Under Seal, and Motion Challenging "Confidential" Designation of Certain Documents Produced by Kinsale Insurance Company [Doc. 64]; and (3) grant, in part, the Motion for Partial Summary Judgment as to Insurance Coverage [Doc. 63].

1

## BACKGROUND

This matter stems from an insurance coverage dispute between the parties arising from a fire, which occurred on October 31, 2019, at defendant JDBC Holdings, Inc. d/b/a/ The CBD Factories' ("defendant") facility at 471 Cold Storage Road, Charles Town, West Virginia. [Doc. 1 at ¶¶ 7 & 20]. At the time of the fire, defendant's facility was insured by Primary Property Policy #0100095800-00 ("the policy"), which was issued by plaintiff Kinsale Insurance Company ("plaintiff"). [Id. at ¶ 14].

Plaintiff filed this pending lawsuit seeking rescission of the policy based on alleged material misrepresentations on defendant's insurance application; alternatively, plaintiff seeks a declaration of no coverage based upon the conditions and exclusions of the policy. [Id. at ¶ 1]. Defendant operates as a business created in 2019 in response to the recent federal and state legalization of industrial hemp and hemp-derived products. [Doc. 67 at 3]. More specifically, defendant sought to process industrial hemp into cannabidiol ("CBD") and other hemp-derived products for wholesale manufacturing and pharmacology clients. [Id.].

On June 11, 2019, defendant entered into a lease agreement for 20,000 square feet of warehouse space located at the aforementioned address. [Doc. 67-1]. As part of retrofitting the leased space, defendant contracted with two vendors to install anti-theft and fire protection systems for the facility. On June 17, 2019, defendant contracted with BK Connected Solutions for "Full Installation" of an IP Video surveillance system with ten (10) internal and four (4) external cameras, a commercial fire and burglary alarm with six (6) smoke detectors and two (2) pull stations, and an electromagnetic access control system with key fobs. [Doc. 63-2]. Specifically, defendant paid BK Connected Solutions $9,000 as a required

2

deposit for the total cost of the work.  [Id.].  By signing and paying the deposit, defendant

"authorized [BK Connected Solutions] to perform all work as specified" in the BK Connected

Solutions quote, deposit, and receipt.  [Id.].

On July 19, 2019, defendant received a quote from Brewer & Company of WV, Inc. "to

design, furnish, and install a fire protection system for the new CBD factory," including

"sprinkler protection in the office, lab, safe room, bathrooms and breakroom" for an estimated

price of $89,700.  [Doc. 63-3].  On August 15, 2019, defendant executed its contract with

Brewer & Company of WV, Inc.  [Id.].  On August 19, 2019, defendant paid Brewer &

Company of WV, Inc. a deposit of $44,850 to commence work.  [Id.]; see also [Doc. 63-4].

To allow Brewer & Company of WV, Inc. to complete its work, defendant installed a mainline

extension and fire hydrant to connect the City of Charles Town's water supply. [Doc. 63-5 at

111:18--112:16; Doc. 63-6].

On the recommendation of its general contractor, defendant contacted Brian Wilkins

of Wilkins Insurance Agency to assist it with procuring insurance for its operations and facility.

[Doc. 63-5 at 181:5–20].  In turn, Mr. Wilkins began communications with Patrick Taylor, an

insurance producer with brokerage Scottish American, in an effort to procure insurance for

defendant.  [Docs. 63-7, 63-8, & 63-9].

On August 27, 2019, defendant completed its first insurance application by finalizing

plaintiff's "Cannabis Supplemental Application" form.  [Doc. 63-9].  In said application,

defendant disclosed it would be using ethanol, methanol, and acetone as solvents in its

extraction process, and that its facility's "fire suppression [was] subcontracted to Brewer

3

Sprinklers & BK Solutions."  [Id.].   The following day, Mr. Wilkins emailed the signed supplement to plaintiff through its agent, Mr. Taylor, at Scottish American.  [Id.].

At Mr. Taylor's request, defendant also completed a standard ACORD application form and a hemp/CBD supplement for James River Insurance.  [Doc. 63-10].  In the ACORD application, defendant represented that its "sprinkler system [was] being installed[.]" [Doc. 63-11].  Defendant also stated on the ACORD application that it would be using ethanol and methanol as solvents. [Id. at 3]. Mr. Wilkins forwarded the completed ACORD application to Mr. Taylor. [Doc. 63-10]. Ultimately, defendant selected plaintiff as its property insurer and Mr. Taylor bound coverage on September 11, 2019.  [Doc. 63-12].

On October 31, 2019, defendant's staff were testing a piece of equipment in the facility's lab. [Doc. 65-4 at 74:17–23]. The testing required defendant's staff to mix acetone, methanol, water, and CBD isolate. [Id. at 74:24 - 75:20]. One of defendant's staff set a heat gun down on a recently delivered table that was encapsulated with plastic wrap. [Doc. 65-2 at 160:2–16]. The heat gun caused the plastic wrap to ignite which, in turn, caused the vapors from the acetone and methanol in the lab to ignite, fueling the subject chemical fire. [Doc. 65-5 at 94:8–22].

## STANDARD OF REVIEW

### I. Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary

judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted). Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another." *Beale v. Hardy*, 769

5

F.2d 213, 214 (4th Cir. 1985). Further, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

When cross-motions for summary judgment are before a district court, as here, the same standards of review are applied. *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983). Each motion must be considered individually on its own merits, and the facts relevant to each must be viewed in the light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion. *Rossignol*, 316 F.3d at 523 (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

## II. The Federal Declaratory Judgment Act

Federal courts with diversity jurisdiction must apply state substantive law but federal procedural law. *Liberty Corp. Capital Ltd. v. Peacemaker Nat'l Training Ctr., LLC*, 348 F.Supp.3d 585, 590 (N.D. W.Va. 2018) (Groh, C.J.). The Declaratory Judgment Act, 28 U.S.C. § 2201, is a procedural statute which grants district courts the discretionary power to entertain declaratory judgment actions. *State Farm Fire & Cas. Co. V. Kirby*, 919 F.Supp. 939 (N.D. W.Va. 1996) (Keeley, J.).

To obtain declaratory relief:

6

> [t]he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. The relief is available only for a concrete case admitting of an immediate and definite determination of the legal rights of the parties.

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 242–43 (1952). Moreover, a declaration of parties' rights under an insurance contract is an appropriate use of the declaratory judgment mechanism. *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998). "The declaratory judgment action is designed to allay exactly the sort of uncertainty that flows from the threat that ambiguous contractual rights may be asserted." *Id*.

### THE POLICY

Plaintiff issued a new, surplus lines property insurance policy to defendant, as the named insured, bearing Policy No. 0100095800-00, with effective dates of September 11, 2019, to September 11, 2020. [Doc. 65-7]. The subject policy includes the following exclusion:

### POLLUTION EXCLUSION . . .

This Policy does not insure:

      1. <u>any</u> loss, damage, cost or expense; [or]

      2. <u>any</u> increase in insured loss, damage, cost or expense; . . .

7

which <u>arises from</u> **any kind of seepage or any kind of pollution and/or contamination**, or threat thereof, whether or not caused by or resulting from a peril insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, cleanup or removal of "any kind of seepage or any kind of pollution and/or contamination" or threat thereof.

The term "**any kind of seepage or any kind of pollution and/or contamination**" as used in this Endorsement includes . . .

1. seepage of, or pollution and/or contamination by, . . . any material designated as a "hazardous substance" by the United States Environmental Protection Agency . . . and

2. the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

This exclusion replaces and supersedes any provision in the policy that provides insurance, in whole or in part, for these matters.

[Doc. 65-7] (emphasis supplied).

The policy also includes two separate protective safeguard endorsements that required defendant to maintain certain protective safeguards at the facility. The protective safeguard endorsement, which required defendant to maintain an automatic sprinkler system, provides:

8

## PROTECTIVE SAFEGUARDS . . .

1.      <u>As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.</u>

2.      The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1" Automatic Sprinkler System**, including related supervisory services.

Automatic Sprinkler System means:

a.      Any automatic fire protective or extinguishing system, including connected:

(1)      Sprinklers and discharge nozzles;

(2)      Ducts, pipes, valves and fittings;

(3)      Tanks, their component parts and supports; and

(4)      Pumps and private fire protection mains.

b.      When supplied from an automatic fire protective system:
(1)      Non-automatic fire protective systems; and

(2)      Hydrants, standpipes and outlets.

**"P-2" Automatic Fire Alarm**, protecting the entire building, that is:

a.      Connected to a central station; or

b.      Reporting to a public or private fire alarm station . . .

B.      The following is added to the EXCLUSIONS section . . .

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you: . . .

2.      Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

9

[Doc. 65-7] (emphasis supplied).

The second protective safeguard endorsement, which required defendant to maintain a central station burglar alarm, interior motion detectors, and an interior and exterior video surveillance system, provides:

### PROTECTIVE SAFEGUARDS – THEFT . . .

### SCHEDULE

| Prem. No. | Bldg. No. | Protective Safeguard Symbol | P-9 Symbol Description |
|---|---|---|---|
| 1 | 1 | P-9 | 1.  Fully operational central station burglar alarm that is activated at all times that your business is closed to the general public except during your normal closing and opening activity.<br><br>2.  Fully operational interior motion detectors that are activated at all times that your business is closed to the general public except during your normal closing and |
|  |  |  | opening activity.<br><br>3.  Fully operational interior and exterior video surveillance that is actively monitoring and recording all exterior doors and windows twenty-four hours a day and seven days a week.  Video surveillance tapes must be provided to us for the 14 days prior to the loss . . . |

. . .

**PROTECTIVE SAFEGUARDS**

1.   <u>As a condition of this insurance, you are required to have the protective devices, safeguards, procedures or services listed in the Schedule above in place, in complete working order and fully operational.</u>

2.      With respect to each location or building, the protective safeguards, procedures or services to which this endorsement applies are identified by the following symbol:

"P-9" The protective safeguards, procedures or services as described in the the Schedule.

[Doc. 65-7] (emphasis added).

## DISCUSSION CONCERNING MOTION FOR LEAVE TO FILE UNDER SEAL AND TO CHALLENGE IMPROPER CONFIDENTIALITY DESIGNATIONS

As a preliminary matter, this Court will address the pending Motion for Leave to Provisionally File JDBC's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as to Insurance Coverage and Supporting Exhibits Under Seal, and Motion Challenging "Confidential" Designation of Certain Documents Produced by Kinsale Insurance Company [Doc. 64].[1]  Therein, defendant moves this Court to lift the confidential designations on several filings and lift the seal on said filings allowing public view. [Doc. 64-1].  As identified by plaintiff, the only confidential designations remaining in dispute relate to those placed by plaintiff on its underwriting guidelines and underwriting notes. [Doc. 73 at 4].   Accordingly, this Court will examine the propriety of those confidential designations prior to addressing the merits of the parties' competing motions for summary judgment, which rely, in part, on the confidential documentation in dispute.

In determining whether documents contain confidential commercial information or trade secrets, courts consider the following factors:

---

[1]This Court previously granted the Motion, in part, thereby permitting defendant to file certain pleadings and supporting exhibits under seal. See [Doc. 68].  Instead, this discussion section addresses the remaining request in the Motion in which defendant challenges various confidentiality designations asserted by plaintiff.

(1) the extent to which the information is known outside of the business; (2) the

extent to which it is known by employees and other involved in the business; (3)

the extent of measures taken by the business to guard the secrecy of the

information; (4) the value of the information to the business and to its

competitors; (5) the amount of effort or money expended in developing the

information; (6) the ease or difficulty with which the information could be

properly acquired or duplicated by others.

*Moses Enterprises, LLC v. Lexington Ins. Co.,* 2020 WL 7634165, at *3 (S.D. W.Va. Dec.

22, 2020). "[T]he absence of evidence as to any one factor does not necessarily preclude a

finding that a trade secret exists." *McGough v. Nalco Co.*, 496 F.Supp.2d 729, 740 (N.D.

W.Va. 2007) (Goodwin, J.). Rather, "[t]he factors should be viewed as instructive guidelines,

weighed together in making that determination." *Id.* Further, "[a]bsolute secrecy is not

essential," and limited disclosure does not destroy the protection. *Trandes Corp. v. Guy F.

Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993).

Numerous courts have recognized that internal insurance company guidelines and

manuals are confidential and appropriately protected from public disclosure by confidentiality

orders. *See Moses*, 2020 WL 7634165, at *4 (finding claim handling guidelines were

confidential and protected from public disclosure); *Anderson v. Reliance Standard Life Ins.

Co.*, 2012 WL 32568, at *5 (D. M.D. Jan. 5, 2012) ("I am satisfied that an insurance

company's claims manual is the type of commercial information that warrants a confidentiality

agreement when it is produced for discovery."); *Paull Assocs. Realty, LLC v. Lexington

Ins. Co.*, 2014 WL 12596397, at *3 n.1 (N.D. W.Va. Jan. 9, 2014) (Seibert, M.J.) ("The Court

12

is well aware that claims manuals are often proprietary in nature.  Accordingly, should the Defendant so request, the Court will consider entering a protective order to provide adequate protections for Defendant's confidential or proprietary materials.")

While defendant asserts that plaintiff has improperly designated the underwriting guidelines and underwriting notes as confidential, this Court does not agree.  A review of the underwriting guidelines reveal that the documentation discusses plaintiff's overall strategy and instructions for underwriting risks in the cannabis industry.  Additionally, the guidelines describe the cannabis industry and market based on plaintiff's own market research.  Further, the guidelines discuss plaintiff's pricing strategy with respect to its policies.

Similarly, plaintiff's underwriting notes describe the steps it took to analyze defendant as an insured and to structure and price defendant's insurance policy.  This documentation contains plaintiff's proprietary underwriting processes, procedures, and decisions.  As such, this Court finds that plaintiff's confidentiality designations were entirely appropriate and the documentation at issue will remain sealed as confidential, and defendant's Motion challenging the confidentiality designations will be denied.[2]

### DISCUSSION CONCERNING MOTIONS FOR SUMMARY JUDGMENT

The central dispute between the parties centers on whether coverage exists based on the language of the aforementioned policy for defendant's losses relating to the subject fire. The parties assert multiple arguments in support of their motions for summary judgment concerning the same, and this Court will address each in turn.

---

[2]Given this Order's reliance on the aforementioned confidential materials, this Court instructs this Order to be docketed under seal.

13

## I. COUNT III: The Protective Safeguards Endorsements

Plaintiff argues it is entitled to summary judgment on Count III, which alleges that no coverage exists under the subject policy based on the policy's protective safeguards endorsements. [Doc. 65-1 at 1]. More specifically, plaintiff alleges that defendant failed to maintain a sprinkler system, a central station burglar alarm, motion detectors, or a video surveillance system as required by the policy's endorsements. [Id.].

Plaintiff contends that defendant's failure to comply with these safeguard conditions vitiates coverage. [Doc. 65-1 at 16]. Conversely, defendant argues that the protective safeguards endorsement concerning theft does not bar coverage because it is unrelated to the subject loss. [Doc. 67 at 14]. Further, defendant argues that plaintiff is estopped from denying coverage under the protective safeguards endorsement concerning fire mitigation equipment because plaintiff knew about the lack of said equipment at defendant's facility prior to binding coverage. [Id.].

### A. Coverage is not vitiated by the protective safeguard endorsement concerning theft.

As indicated above, the "Protective Safeguards - Theft" endorsement provides as follows:

> If any protective device, safeguard, procedure or services requirement listed above is not fully met, theft coverage is deleted and this policy shall not insure against loss caused directly or indirectly by the peril of theft.

[Doc. 63-16]. Although it is undisputed that defendant did not have a central station burglar alarm, interior motion detectors, or an inferior and exterior video surveillance system at the facility at the time of the subject loss, the "Protective Safeguards - Theft" endorsement plainly

14

states that failure to satisfy its conditions simply remove *theft* coverage and has no effect on coverage for other perils.  As such, this endorsement has no bearing on the question of coverage with respect to the subject fire.

> **B.      Coverage is not vitiated by the protective safeguard endorsement concerning fire.**

Similarly, plaintiff contends the undisputed fact that defendant did not have the required fire safeguards installed at the time of loss vitiates coverage.  [Doc. 65-1 at 17].  However, defendant contends plaintiff is estopped from denying coverage under the fire protective safeguards endorsement because plaintiff knew at the time of the insurance application that defendant did not have said fire protection safeguards installed at the subject facility. [Doc. 67 at 14].

"In the law of insurance the elements of an estoppel against an insurer are conduct or acts on the part of the insurer which are sufficient to justify a reasonable belief on the part of the insured that the insurer will not insist on a compliance with the provisions of the policy and that the insured in reliance upon such conduct or acts has changed his position to his detriment."  Syl. Pt. 4, *Knapp v. Independence Life & Acc. Ins. Co.*, 146 W.Va. 163, 118 S.E.2d 631 (1961).

> An insurer has an obligation to its insureds to do its underwriting at the time a policy application is made, not after a claim is filed.  It is patently unfair for a claimant to obtain a policy, pay his premiums and operate under the assumption that he is insured against a specified risk, only to learn after he submits a claim that he is not insured, and, therefore, cannot obtain any other

policy to cover the loss. The insurer controls when the underwriting occurs. It

therefore should be estopped from determining whether to accept an insured

six months or more after a policy is issued. If the insured is not an acceptable

risk, the application should be denied up front, not after a policy is issued. This

allows the proposed insured to seek other coverage with another company

since no company will insure an individual who has suffered serious illness or

injury.

*Cf. Admiral Ins. Co. v. Fisher*, 2018 WL 2688182, at *7 n.13 (W.Va. 2018) (memorandum

decision).

The rule that an insurance company will not be permitted to defeat a recovery

upon a policy issued by it by proving the existence of facts which would render

it void, where it had full knowledge of them when the policy was issued, is too

well established by the authorities in this state to require further discussion.

*Medley v. German Alliance Ins. Co.*, 55 W.Va. 342, 47 S.E. 101, 107 (1904). "To take the

benefit of a contract, with full knowledge of all the facts, and attempt afterwards to defeat it,

when called upon to perform, by asserting conditions relating to those facts, would be to claim

that no contract was made, and thus operate as a fraud upon the other party." *Id.*

In response, plaintiff contends that estoppel should not apply because at the time it

bound coverage, it believed the sprinkler system was either "fully installed or would be very

soon." [Doc. 81 at 14]. Moreover, plaintiff asserts that defendant's acceptance of the

insurance quote, which expressly provided that a sprinkler system was a condition precedent

to coverage for a loss, placed defendant on notice that fire suppression system was required

16

to ensure coverage. [Id. at 14–15]. Alternatively, plaintiff contends that the reasonableness of defendant in obtaining installation of fire protection equipment at the subject facility is a question for a jury and not resolvable at the summary judgment stage. [Id. at 16]. This Court does not agree.

The undisputed portion of the record herein clearly demonstrates that defendant disclosed that the fire prevention systems at issue were not installed, but were instead "being installed" in its initial application for insurance. *See* [Docs. 63-11, 69-2 at 75:8–16; 69-4 at 58:16–59:2]. Despite this knowledge, plaintiff approved defendant's application, bound and issued the subject policy, and accepted defendant's $80,000.00 premium in exchange for coverage. [Doc. 63-12]. Because plaintiff issued the subject policy with knowledge of facts that would void the policy under the fire safeguards endorsement and because defendant relied on that decision by not obtaining coverage elsewhere, plaintiff is estopped from foregoing coverage based on this endorsement.[3]

## II. COUNT IV: The Pollution Exclusion

Plaintiff argues it is entitled to summary judgment on Count IV, which alleges that defendant's fire loss claim should be denied under the policy's "Pollution Exclusion" endorsement cited above. According to plaintiff, the policy's Pollution Exclusion excludes "any loss, damage, cost or expense . . . which arises from any kind of seepage or any kind of pollution and/or contamination." [Doc. 65-1 at 9]. Plaintiff further asserts that the exclusion

---

[3]Defendant also asserts plaintiff waived its right to deny coverage under the fire safeguards endorsement. *See* [Doc. 67 at 17]. Having found that the fire safeguards endorsement does not vitiate coverage under defendant's theory of estoppel, this Court need not determine whether plaintiff waived its right to deny coverage under this theory.

bars coverage for any damage that results from or is causally connected to the (1) "seepage of, or pollution and/or contamination by, . . . any material designated as a 'hazardous substance' by the United States Environmental Protection Agency" or (2) "the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment." [Id. at 9–10]. Based on this exclusion, plaintiff asserts that coverage is vitiated by the pollution exclusion because it is undisputed that acetone, ethanol, and methanol were utilized at the facility and fueled the subject fire. [Id.].

In response, defendant contends that plaintiff's "Pollution Exclusion" endorsement is unenforceable because it contains ambiguities and violates West Virginia Code § 33-17-2. [Doc. 67 at 23]. Moreover, defendant asserts that the root cause of the loss stemmed from the subject fire rather than damage arising from the release of pollutants like those described under the pollution endorsement. [Doc. 83 at 6–7]. This Court agrees with defendant.

"An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syl. Pt. 7, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987). "Where the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." Syl. Pt. 8, *National Union Fire Ins. Co. of Pittsburgh v. Miller*, 228 W.Va. 739, 724 S.E.2d 343 (2012). "An exclusion in a general business liability policy should not be so construed as to 'strip the insured of protection against risks incurred in the normal operation of his business,' especially when the insurer was aware of the nature of the insured's normal operations when the policy was sold." *McMahon & Sons*, 177 W.Va. at 742, 356 S.E.2d at 496.

18

"Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." Syl. Pt. 1, *Shamblin v. Nationwide Mut. Ins. Co.*, 175 W.Va. 337, 332 S.E.2d 639 (1985). "Where a provision of an insurance policy is ambiguous, it is construed against the drafter, especially when dealing with exceptions and words of limitation." *Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995); *see also Tackett v. American Motorists Ins. Co.*, 213 W.Va. 524, 531, 584 S.E.2d 158, 165 (2003) ("Where, however, the policy language under consideration is ambiguous, such ambiguities are typically resolved in favor of the insured.").

It is undisputed that the subject policy was intended to provide coverage for fire and smoke claims.  [Doc. 69-2 at 31:20 - 32:14].  However, as identified by defendant, smoke could fall under the pollution exclusion in the subject policy, which was undisputably issued to provide coverage for possible fire damage at defendant's facility.

Similarly, it is undisputed that defendant's claim is for fire and smoke damage and not for exposure to or cleanup of pollutants or other hazardous substances. [Doc. 69-4 at 17:7–21]. The proximate cause of the loss was an accidental fire started by a heat gun that ignited a table surface, and not exposure to or cleanup of contaminants for which coverage would have been excluded under the pollution exclusion endorsement.

As articulated by the Supreme Court of Appeals of West Virginia:

When examining whether coverage exists for a loss under a first-party insurance policy when the loss is caused by a combination of covered and specifically excluded risks, the loss is covered by the policy if the covered risk

19

was the efficient proximate cause of the loss.  No coverage exists for a loss if

the covered risk was only a remote cause of the loss, or conversely, if the

excluded risk was the efficient proximate cause of the loss.  The efficient

proximate cause is the risk that sets others in motion.  It is not necessarily the

last act in a chain of events, nor is it the triggering cause.  The efficient

proximate cause doctrine looks to the quality of the links in the chain of

causation.  The efficient proximate cause is the predominating cause of the

loss.

Syl. Pt. 8, *Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1 (1998).  The

efficient proximate cause of the loss rule "permits a recovery under the policy where the loss

occurs due to a loss from a covered peril which also sets into motion a chain of events

occurring in an unbroken sequence culminating in damage from an excluded peril." *Murray*,

203 W.Va. at 488 n.10.  In consideration of the record as a whole and the foregoing body of

law, this Court finds that the pollution exclusion endorsement does not apply to defendant's

fire and smoke damage claim and, as such, does not vitiate coverage for the subject loss.

**III.  COUNTS 1 & 2: Rescission and Misrepresentation**

Plaintiff also seeks to rescind the subject policy pursuant to W.Va. Code § 36-6-7(b)

and (c), asserting that defendant made material misrepresentations on its application for

insurance.  [Doc. 1 at ¶¶ 33–39].  Further, plaintiff seeks to void the subject policy under the

"Concealment, Misrepresentation or Fraud" clause of the policy's "Common Conditions –

Property" endorsement.  [Id. at ¶¶ 19 & 40–42].  Plaintiff's argument concerning these two

20

counts relies on the previously addressed argument that defendant misrepresented the status of its installation of a fire suppression system at the subject facility.

"Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under [an insurance] policy unless: . . . (b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or (c) The insurer in good faith would either not have issued the policy . . . or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise." W.Va. Code  § 36-6-7.

"W.Va. Code, 33-6-7 (1957), is designed to alleviate the harshness of the common law and is to be liberally construed in favor of the insured." Syl. Pt. 1, *Massachusetts Mut. Life Ins. Co. v. Thompson*, 194 W.Va. 473, 460 S.E.2d 719 (1995). A corollary to this rule is that the grounds for rescinding a policy under W.Va. Code § 33-6-7(b) and (c) are to be narrowly construed against the insurer because they are exceptions to the statute's general rule that "[m]isrepresentations, omissions, or concealments of facts, or incorrect statements shall not prevent a recovery under the policy." *See Powell v. Time Ins. Co.*, 181 W.Va. 289, 295, 382 S.E.2d 341, 348 (1989).

As noted previously, the undisputed portion of the record herein clearly demonstrates that defendant disclosed that the fire prevention systems at issue were not installed, but were instead "being installed" in its initial application for insurance. *See* [Docs. 63-11, 69-2 at 75:8–16; 69-4 at 58:16–59:2]. Despite this knowledge, plaintiff approved defendant's application, bound and issued the subject policy, and accepted defendant's $80,000.00

premium in exchange for coverage. [Doc. 63-12]. These facts provide no cognizable basis for plaintiff's claims for rescission and misrepresentation.

## IV. Defendant's Counterclaims

In its Motion for Partial Summary Judgment as to Insurance Coverage, defendant asserts that if this Court declares that plaintiff has a duty to accept and pay defendant's insurance claim, defendant would be entitled to partial summary judgment in its favor as to liability on its counterclaims for breach of contract and common law bad faith. [Doc. 63 at 2–3]. Although this Court has found that plaintiff has a duty to accept and pay defendant's insurance claim, defendant is not entitled to partial summary judgment on its counterclaims at this time.

As noted by the Supreme Court of Appeals of West Virginia, bringing or defending an action to promote or protect one's economic or property interests does not *per se* constitute bad faith, vexatious, wanton or oppressive conduct. *See Sally-Mike Properties v. Yokum*, 179 W.Va. 48, 365 S.E.2d 246 (1986). Here, plaintiff filed its declaratory judgment action to determine whether it owed a duty to indemnify defendant under the terms of the subject policy. While this Court ultimately rejected plaintiff's arguments as explained above, plaintiff's attempt to protect its own economic interest does not automatically entitle defendant to partial summary judgment on its counterclaims.

### CONCLUSION

For the reasons contained herein, this Court **DECLARES** that Plaintiff has a duty under the subject policy to accept and pay defendant's insurance claim. Accordingly, this Court

22

**ORDERS** as follows: (1) Kinsale Insurance Company's Motion for Summary Judgment [**Doc. 65**] is **DENIED**; (2) the Motion for Leave to Provisionally File JDBC's Memorandum of Law in Support of its Motion for Partial Summary Judgment as to Insurance Coverage and Supporting Exhibits Under Seal, and Motion Challenging "Confidential" Designation of Certain Documents Produced by Kinsale Insurance Company [**Doc. 64**] is **DENIED IN PART**; and (3) the Motion for Partial Summary Judgment as to Insurance Coverage [**Doc. 63**] is **GRANTED IN PART**.

Having found that Plaintiff has a duty under the subject policy to accept and pay defendant's insurance claim, this Court **DISMISSES** Plaintiff's Complaint [**Doc. 1**] for the reasons articulated herein.

It is so **ORDERED**.

**DATED**: March **31**, 2021.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**